**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**George Anthony STEWART,
Defendant–Appellant.**

**No. 88–1250.**

United States Court of Appeals,
Tenth Circuit.

Feb. 8, 1989.

Charles Szekely, Asst. Federal Public Defender (Michael G. Katz, Federal Public Defender, with him on the brief), Denver, Colo., for defendant-appellant.

Robert G. Chadwell, Asst. U.S. Atty. (Michael J. Norton, U.S. Atty., and Kathryn Meyer, Asst. U.S. Atty., with him on the brief), Denver, Colo., for plaintiff-appellee.

Before LOGAN, SETH and TACHA, Circuit Judges.

SETH, Circuit Judge.

Defendant was indicted for multiple violations of Title 21 of the United States Code after members of the Denver Police Department's Special Weapons Attack Team (S.W.A.T.), acting in tandem with federal agents and under the authority of a federal search warrant, stormed into his residence and seized numerous bags containing cocaine and marijuana. The trial court conducted an evidentiary hearing on the defendant's motion to suppress the seized evidence and denied the motion. The defendant then entered a conditional plea of guilty to distributing cocaine in violation of 21 U.S.C. § 841(a)(1), reserving the right to appeal the trial court's denial of the motion to suppress. This appeal followed. Because we find that the Denver S.W.A.T. team's entry into the defendant's residence violated 18 U.S.C. § 3109, we reverse the trial court's denial of defendant's motion to suppress the seized evidence.

I.

An F.B.I. agent secured a federal warrant to search the defendant's house and to seize any drugs and firearms found within. The house was located in Denver and the search was to be a joint operation of the F.B.I. and the Denver Police S.W.A.T. team. The affidavit attached to the search warrant contained only conclusory statements, purportedly based on the affiant's experience (15 months as a special agent) and conversations with others regarding typical drug dealing operations. It noted that drug dealers usually keep records, receipts, cash and contraband at their residences, and maintain the names of associates. As to firearms, the affidavit again spoke in generalities:

"g. That cocaine and/or controlled substances traffickers do commonly possess and carry a firearm during the sale and distribution of cocaine and/or controlled substances."

The affidavit was specific only as to the purchase, apparently on two occasions, by an undercover agent of an ounce of cocaine from a Wiley E. McClain. On both occasions, this person was followed to the defendant's house and apparently there obtained the drugs. The search warrant was issued on the basis of the undercover agent's statements and contained no special provisions as to how the entry or search was to be conducted.

The Denver S.W.A.T. team (not the F.B.I.) had decided at least 24 hours before the federal warrant was obtained how the entry into the house was going to be made. The F.B.I. did not participate in this decision and the magistrate who issued the warrant was not advised of the plan. As mentioned, the warrant did not state anything as to how the entry was to be made. The Denver S.W.A.T. team and the F.B.I.

agents arrived at the defendant's house at about 10:30 in the evening. The S.W.A.T. team used a two-man steel battering ram to break down the front door and immediately threw a full charge stun grenade into the living room, where it detonated (as the officers stood back) with an explosion and flash. The occupants were blinded and disoriented for at least five or ten seconds. There was no knock and no warning before the door was broken down and the grenade was detonated. There were three people in the living room at the time, the defendant, a co-defendant and a woman who had no connection with any illegal activity. The co-defendant was slightly injured. None were armed although a semi-automatic pistol was found in an upstairs room during the subsequent search.

In its brief, the Government states that "[o]nce the residence was secured, a search was conducted by federal agents." The S.W.A.T. officers testified that they advised the F.B.I. agents by radio when the house was "secure." The search revealed the following items: three baggies of cocaine, eleven baggies of crack cocaine, two baggies of marijuana, six large bags of marijuana, a weighing scale, breathing masks, a bottle of Superior Inositol, and over $10,000 in cash. A loaded .45 caliber semi-automatic pistol was found in an upstairs bedroom, as mentioned.

There was no testimony that anyone had seen a gun in the house before the search. There were no other facts known to the police that would have led to the inference that firearms were present in the house, although the officers testified that they had been informed some months before that the defendant had been seen with a semi-automatic pistol at another time and place. The information as to the pistol was received from a private investigator, who in turn had heard it from an informer who at the time was smoking marijuana.

The officers had little other information about the defendant or his house. The officers testified that they knew that defendant had sold a small amount of cocaine to an intermediary, as mentioned, who then sold it to an undercover agent. They knew

that defendant was a Jamaican and that some Jamaican drug dealers fortified their houses and most were armed. There had been no surveillance of the house and the officers did not know who or what was in the house at the time. The officers had no reason to think that the house was barricaded and indeed it was not barricaded.

The trial court did not consider whether the search was illegal given that the warrant was issued to an F.B.I. agent but executed by the Denver Police S.W.A.T. team. *See* Fed.R.Crim.Proc. 41(c); 18 U.S.C. § 3105. We thus do not address that issue on appeal.

## II.

In order to decide if the evidence obtained in the search was properly entered into evidence, we must determine whether the entry into the defendant's residence was lawful. The Government, citing *Dalia v. United States*, 441 U.S. 238, 99 S.Ct. 1682, 60 L.Ed.2d 177, argues that the method used in executing a warrant is left to the officers' discretion. Its argument is that officers may use what they know or have heard in deciding how the warrant will be executed, and this information may be in addition to that provided in the affidavit for the warrant. The dramatic method here used by the Denver S.W.A.T. team to accomplish the entry and to "secure" the premises was selected in the exercise of the team's discretion. It is apparent that this discretion is not without limitation as the action taken must be within statutory and constitutional limitations.

The statutory standard governing the conduct of the officers in this case is contained in 18 U.S.C. § 3109, which requires the use of a knock and warning procedure:

"The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant."

The Court in *Miller v. United States,* 357 U.S. 301, 313, 78 S.Ct. 1190, 1198, 2 L.Ed.2d 1332, stated as to this provision:

"The requirement of prior notice of authority and purpose before forcing entry into a home is deeply rooted in our heritage and should not be given grudging application. Congress, codifying a tradition embedded in Anglo–American law, has declared in § 3109 the reverence of the law for the individual's right of privacy in his house."

Because we resolve this case under 18 U.S.C. § 3109, it is unnecessary to consider the defendant's arguments under the Fourth Amendment.

This court has held that compliance with § 3109 may be excused only when "exigent circumstances" exist. Thus "[i]f the record clearly establishes ... that the executing officers failed to announce their authority and purpose before forcibly entering the dwelling, and that no exigent circumstances were shown, the evidence seized must be suppressed as the fruit of an unlawful search." *United States v. Ruminer,* 786 F.2d 381, 383 (10th Cir.) (citing *Sabbath v. United States,* 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828).

There is no contention by the Government that the "knock and announce" requirement was here followed in any respect. The steel battering ram operated by the two S.W.A.T. team officers knocked down the door without any warning whatsoever and the grenade was immediately thrown inside where it exploded. The S.W.A.T. team was in army fatigue type clothes. No uniforms or badges were apparent. The evidence seized during the search must be excluded unless it is determined that "exigent circumstances" existed at the time of the search that would justify the officers' decision not to knock and announce their purpose.

■ The question of whether exigent circumstances exist in the execution of a search warrant is a mixed question of law and fact. While we must accept the trial court's findings on the underlying facts surrounding the execution of the warrant unless they are clearly erroneous, *Rumin-*

*er,* 786 F.2d at 383, the determination of whether those facts satisfy the legal test of exigency is subject to de novo review. *Supre v. Ricketts,* 792 F.2d 958, 961 (10th Cir.) (citing *United States v. McConney,* 728 F.2d 1195, 1199–1205 (9th Cir.)).

■ The term "exigent circumstances," in conjunction with the entry of a residence during the execution of a search warrant, refers to those situations where "the officers believe there is an emergency situation and ... their belief is objectively reasonable." *United States v. Spinelli,* 848 F.2d 26, 29 (2d Cir.). *See also United States v. Flickinger,* 573 F.2d 1349, 1355 (9th Cir.) (exigent circumstances are those which suggest an "urgent need for immediate action"). The reasonableness of the officers' conduct hinges on the facts within their knowledge indicating exigency. *McConney,* 728 F.2d at 1206. The conclusion of exigency under these facts must be especially clear in this case where there was no knock or warning whatsoever, where there was no information as to who was in the house, where the destruction of physical property took place, and where the occupants of the residence could be injured as a result of the entry. We must determine whether the officers, after considering the *particular* facts regarding the premises to be searched and the circumstances surrounding the execution of the warrant, could reasonably have decided that an urgent need existed for such an entry into the premises. *Jones v. United States,* 362 U.S. 257, 272, 80 S.Ct. 725, 737, 4 L.Ed.2d 697 ("a claim under 18 U.S.C. § 3109 depends upon the particular circumstances surrounding the execution of the warrant") (citing *Miller v. United States,* 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332).

### III.

Two factors lead us to conclude that the circumstances surrounding the execution of this warrant were not sufficiently exigent to justify the type of forcible entry employed by the Denver S.W.A.T. team. First, all of the "exigent circumstances" sought to be relied on were matters that

were known and that existed at least 24 hours before the warrant was issued. It is difficult to understand how the circumstances were "exigent" when the officers had an entire day to formulate a response to those circumstances. The exigent circumstances exception to 18 U.S.C. § 3109 was developed so as to allow officers to formulate an immediate response to emergency situations that arise on the scene during the execution of a search warrant. In this case, the method of entry used was not formulated in response to an emergency but instead was carefully planned without specific information well in advance of the time the warrant was obtained.

Second, the facts offered in support of the officers' decision on the mode of entry all consisted of generalities that bore no relation to the particular premises being searched or the particular circumstances surrounding the search. Each of the facts outlined in the affidavit supporting the warrant pertained to "drug dealers" or "cocaine and/or controlled substances traffickers" in general. None of these facts specifically pertained to the defendant or the defendant's house. No officer had any information to the effect that the house had been barricaded or fortified. No surveillance was conducted to determine if the house had been fortified or if the occupants were monitoring activity in the surrounding area. Most importantly, no effort was made to determine who was in the house at the time the entry was made. This information became crucial once it was decided to use the stun grenade.

The officers were in possession of only two specific facts regarding the defendant that were relevant to the execution of the warrant other than the apparent sales of drugs on two occasions. First, they had been told that the defendant had been seen on one occasion with a pistol. This fact alone, however, does not justify the method used to enter the house. This information was obtained from a private investigator, who in turn obtained it from an informant. The informant was under the influence of marijuana at the time he told this to the investigator. The information was stale and involved only one incident. The officers had no information that would have led them to believe that the defendant armed himself on a regular basis. The officers thus had no information whether firearms were present within the house. The one incident involving the defendant and a pistol took place away from the defendant's house. Any conclusions regarding the presence of firearms on the premises were purely conjectural.

■ The second piece of information the officers possessed about the defendant was that he is of Jamaican descent. This information seems to have inordinately influenced the conduct of the officers in this case. It seems sufficient to note that the race or nationality of a suspect cannot serve as a basis for failing to comply with the requirements of 18 U.S.C. § 3109.

■ Thus, a failure to comply with the provisions of 18 U.S.C. § 3109 cannot be excused unless the conduct of the officers involved a reaction to the type of specific facts that were absent here. The Government would have us justify this circumvention of § 3109 on the basis of general conclusory statements regarding the conduct of drug dealers in general. Followed to its logical conclusion, the Government's argument would obviate the necessity for complying with the statute in any search of the residence of an alleged drug dealer.

In those cases where the failure of the police to follow the requirements of § 3109 has been upheld, the police were in possession of specific facts regarding the premises to be searched or its occupants that demonstrated that compliance with the statute would be dangerous or imprudent. A good example of a situation where an unannounced entry into a home was justified due to the presence of exigent circumstances is found in *United States v. Spinelli*, 848 F.2d 26 (2d Cir.). In *Spinelli*, federal agents obtained a warrant to search the house of a man suspected of manufacturing methamphetamines. In holding that the agents' failure to knock was justified by exigent circumstances, the Second Circuit noted that the agents were aware that the suspect had a past history

of firearm possession and a reputation for violence, that the agents had conducted a lengthy surveillance of the suspect's house, and that the agents believed the suspect had become aware of their surveillance. The agents had reason to believe that chemicals on the premises were flammable and explosive, and they were concerned that the suspect might try to destroy evidence by causing an explosion given that he had become aware of the surveillance. The circumstances were even more exigent in that children were present in the neighborhood. The court held that it was reasonable for the agents to break the house's door down without knocking given their knowledge of these specific facts. 848 F.2d at 30.

*United States v. Ramirez,* 770 F.2d 1458, 1460–61 (9th Cir.), also involved the admissibility of evidence seized after police entered the suspects' apartment without knocking. In *Ramirez,* the officers had reason to believe that the suspects were armed within the apartment. The suspects were wanted on murder and kidnapping charges. The officers were aware that the suspects had recently been warned that the F.B.I. was looking for them. The officers conducted surveillance of the premises before entering to determine who was inside. The Ninth Circuit held that the circumstances surrounding the search were sufficiently exigent to justify breaking the door down without knocking. The officers' conduct was reasonable since it was based on specific facts known about the suspects and the apartment.

The opinion of this court in *United States v. Coffman,* 638 F.2d 192, 196–97 (10th Cir.), is of no help to the Government's position. In *Coffman,* there were specific facts that were known to the officers. The agents had been informed prior to entering the dwelling that there were weapons *on the premises. Coffman* did not involve an unannounced forcible entry of the type here at issue. There was testimony that the officers yelled "police" or "federal agents" as they approached the front door of the house. There was additional testimony that the door was partially open when the officers arrived and that the

officers simply pushed it open the rest of the way before entering. The trial court found, and this court accepted, that the defendant had failed to prove the door had been broken down.

For the reasons discussed above, the trial court's denial of defendant's motion to suppress the seized evidence is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.